UNITED STATES of America

v.

Rethamae McKOY, Appellant.

No. 78–1428.

United States Court of Appeals,
Third Circuit.

Argued Sept. 28, 1978.
Decided Jan. 15, 1979.

Peter F. Vaira, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, App. Div., Robert C. Fourr, Asst. U. S. Atty., Philadelphia, Pa., for appellee.

Before SEITZ, Chief Judge, HUNTER, Circuit Judge, and LACEY,* District Judge.

## OPINION OF THE COURT

LACEY, District Judge.

This appeal presents the issue whether retrial of the defendant appellant (McKoy), following termination of her original trial by mistrial declared by the district court over her objection, is violative of the Double Jeopardy Clause of the fifth amendment. McKoy appeals from denial below of her motion to dismiss the indictment on double jeopardy grounds. We reverse.

### I

On October 5, 1977, and following a preliminary examination held on September 7, 1977, before a magistrate who found probable cause, Fed.R.Crim.P. 3, 5.1, McKoy was indicted in three counts, charged with possession of stolen mail (18 U.S.C. § 1708); aiding and abetting the forgery of a United States Treasury check (18 U.S.C. §§ 495 and 2); and uttering of the same check (18 U.S.C. §§ 495 and 2).

Critical to the charges against McKoy, and to the issue before us, was whether McKoy was present in the store of one Piatigorsky in October 1976 when the forged treasury check, which was the subject of the indictment herein, was allegedly passed to Piatigorsky by a customer. At trial and pretrial the United States, relying chiefly upon Piatigorsky's evidence, contended that McKoy was not only present, but indeed had aided and abetted her companion in passing the check. McKoy denied she was present. Additionally, she stated that, at a time between the preliminary examination and the indictment, she had confronted Piatigorsky in his store and that

Louis Lipschitz, Lipschitz & Danella, Philadelphia, Pa., for appellant.

* Sitting by designation.

he had, in the ensuing discussion, admitted that she had not been in the store at the time he received the forged check. Piatigorsky acknowledged the confrontation but denied he had exculpated McKoy.

What was eventually to lead to the mistrial was first brought to the attention of the trial judge at a hearing on January 24, 1978, a month before trial, when McKoy's attorney stated that he had been present during McKoy's confrontation of Piatigorsky and had heard Piatigorsky exculpate McKoy. The court, recognizing the significance of the issue, suggested that McKoy's attorney might have to testify at trial in support of her testimony, and that, if he intended to do so, he should not continue as trial counsel.

The problem raised by the court was then thoroughly discussed, App. 22a–37a; unfortunately, it was not completely resolved. Initially, the court stated that counsel's decision whether to testify or not had to be made before the upcoming hearing on McKoy's motion to suppress Piatigorsky's photographic identification testimony (which was held on February 17, 1978), that if he testified he would have to withdraw as trial counsel, and that, if the suppression motion were to be denied, counsel "would have an affirmative duty to appear as a witness." App. 22a–23a; App. 30a.[1]

Counsel then stated that he was "willing to decide it today. . . . I will not testify. I think I have two other people who will testify." App. 33a–34a. The Assistant United States Attorney then asked the court to bar McKoy's attorney from including, in any questions put at trial to McKoy or any other witnesses to her confrontation with Piatigorsky, any suggestion that the attorney had also been on the scene and "was taking the same position as the witness." App. 34a.

The court, while rejecting this request, indicated that, if McKoy's attorney did make such a reference, the United States would be permitted "to comment very, very freely on that." App. 35a.[2]

The court, unwilling to accept counsel's decision not to testify, then reopened the issue, urging counsel "to make that decision as to whether or not your present client's interest is best served by your appearing as a witness and having someone else try the case." App. 36a–37a. The court then addressed the defendant personally:

> I want you and [your attorney] to discuss whether or not he will appear as a witness and, if he does, then it may mean that, and probably would mean, that you have to get other counsel but I am not going to force him to that decision today.

App. 39a–40a.

By the conclusion of the pretrial hearing on January 24, 1978, the court had thus indicated that it believed McKoy's counsel should testify in her behalf and that, if he did, he could not continue as counsel. Counsel, on the other hand, had told the court that he would not be a witness. Finally, the court had directed counsel and the defendant to reassess the situation, with the implication that if their decision changed, McKoy should obtain new counsel.

The hearing on the defendant's motion to suppress Piatigorsky's identification of McKoy was held on February 17, 1978. McKoy was represented by the same attorney. Piatigorsky made both a photograph and an in-court identification of McKoy and, at the conclusion of the hearing, the court denied the defendant's motion.

Notwithstanding the court's earlier insistence on January 24, that McKoy and her attorney resolve the witness-representation question at or prior to the suppression hear-

---

1. As will appear hereafter, the well-intentioned trial judge later receded from these positions. The motion to suppress Piatigorsky's identification testimony was denied, yet McKoy's counsel continued to represent her throughout the trial, until, during McKoy's testimony, the court again raised the issue of whether he should not testify on her behalf.

2. Obviously, the "comment" would have been related to a failure to call the attorney as a witness. This warning led to an agreement between counsel for the United States and McKoy that no trial witnesses would mention that McKoy's attorney had accompanied her to Piatigorsky's store for the confrontation.

ing, nothing was said on February 17 by the court or counsel about the matter.[3]

This hearing concluded with the court's announcement that a hearing on defendant's motion to suppress the identification testimony of another government witness would be held on February 21, following which trial would commence.

On February 21, as scheduled, the second suppression hearing was held, defendant's motion was denied, and trial commenced. Once again there was no mention of the witness-representation problem by anyone.

Trial resumed on February 22. The United States presented its case throughout that day and on February 23, after which the defendant took the stand in her own defense. After denying on direct examination the charges of the indictment, she was asked about the confrontation she had had with Piatigorsky. She responded that she had been accompanied by one "Tammy." App. 74a.

At this point, McKoy's attorney and the Assistant United States Attorney advised the court at side bar of their agreement that the defendant would not "mention . . . [her attorney's] name as having been in the store at . . . [the] time" of the confrontation. *Id.* After the court expressed its misgivings over what it conceived to be a suppression of the truth and again raised the question of whether the attorney should not testify, it directed questioning to resume. App. 74a–80a. The direct examination was resumed and concluded, App. 82a, after which cross examination was conducted and concluded. App. 82a–86a.

The trial judge, out of the jury's presence, then proceeded to explore for the first time since January 24, the witness-representation matter. App. 86a *et seq.*

Expressing the thought that McKoy's attorney should testify on the confrontation, he was prepared to let the attorney continue as trial counsel until the government attorney objected. Thereafter, and over the defendant's objection, the trial judge declared a mistrial. He made clear his reason for so doing: he wanted to give the defendant time to consult independent counsel on whether her then attorney (a) should testify for her, and if so, (b) whether he should remain as her trial attorney. He then set March 6 as a hearing date of the matter.

■ Appointed counsel for McKoy conferred with her and then, on the adjourned date of March 13, reported to the court. He found defendant to be of "reasonable intelligence" and confirmed what her trial counsel had advised the court during trial, that she understood her rights, that she did not want her trial attorney to act as a witness, and that she wanted him to continue as her attorney. The court then, after addressing the defendant personally, found her choice to be made knowledgeably and intelligently, and announced that the case would be set for retrial, with the same trial attorney representing McKoy. Thereafter, defendant's motion to dismiss the indictment on double jeopardy grounds was made and denied. This appeal followed.[4]

## II

The Double Jeopardy Clause of the fifth amendment is quickly stated: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Constitution, Amendment 5. The problems in interpreting it, however, are not always as readily resolved. "[T]his de-

---

**3.** This is puzzling, particularly since McKoy's attorney cross-examined Piatigorsky about the confrontation. Piatigorsky testified the attorney had been in his store. He denied that he had told McKoy that she had not been present when the forged check was passed. Transcript of February 17, 1978, 41–44.

**4.** The order denying the motion is appealable under 28 U.S.C. § 1291 (1977) as a final order

within the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); *United States v. Venable,* 585 F.2d 71 (3d Cir. 1978); *United States v. Inmon,* 568 F.2d 326 (3d Cir. 1977); *United States v. Di Silvio,* 520 F.2d 247 (3d Cir. 1975).

ceptively plain language has given rise to problems both subtle and complex . . ." *Crist v. Bretz,* 437 U.S. 28, 32, 98 S.Ct. 2156, 2159, 57 L.Ed.2d 24 (1978).

The Supreme Court recently enumerated some of the significant interests served by the Double Jeopardy Clause in the context of a court's *sua sponte* declaration of a mistrial over a defendant's objection.

> Because jeopardy attaches before the judgment becomes final, the constitutional protection also embraces the defendants's "valued right to have his trial completed by a particular tribunal." The reasons why this "valued right" merits constitutional protection are worthy of repetition. Even if the first trial is not completed, a second prosecution may be grossly unfair. It increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. The danger of such unfairness to the defendant exists whenever a trial is aborted before it is completed. Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial.

*Arizona v. Washington,* 434 U.S. 497, 503–05, 98 S.Ct. 824, 829, 54 L.Ed.2d 717 (1978) (footnotes omitted).

■ Given these concerns, the Court has established a stiff test for determining whether retrial can be had after mistrial. While eschewing specific mechanical formulations, *id.* at 506, 98 S.Ct. 824, the Court has repeatedly declared that the United States must shoulder the "heavy burden" of demonstrating that there was "manifest necessity" for a mistrial declared over a defendant's objection to avoid the double jeopardy bar. *Id.* at 505, 98 S.Ct. 824; *United States v. Jorn,* 400 U.S. 470, 483–85,

91 S.Ct. 547, 27 L.Ed.2d 543 (1971); *United States v. Perez,* 9 Wheat. (22 U.S.) 579, 580, 6 L.Ed. 165 (1824).

Under the Court's analysis in *Jorn, supra,* the government generally must demonstrate that, under the circumstances confronting the trial judge, he had no alternative to the declaration of a mistrial. 400 U.S. at 487, 91 S.Ct. 547. *See also Arizona v. Washington, supra,* 434 U.S. at 515–16, 98 S.Ct. 824; and only by considering and exhausting all other possibilities can the judge ensure that the defendant has received the full protection of the Double Jeopardy Clause. In reviewing the decision of the trial court, our duty is to see that alternatives to declaring a mistrial were completely canvassed. *See Dunkerley v. Hogan,* 579 F.2d 141, 146–47 (2d Cir. 1978); *United States v. Grasso,* 552 F.2d 46, 52 (2d Cir. 1977); *United States v. Tinney,* 473 F.2d 1085, 1089 (3d Cir.), *cert. denied,* 412 U.S. 928, 93 S.Ct. 2752, 37 L.Ed.2d 156 (1973).

■ The record here does not reflect that termination of the trial by mistrial was justified by a "manifest necessity" or was the only means by which the "ends of public justice" could be fulfilled. *United States v. Perez, supra,* 9 Wheat. at 580.

The trial judge, concerned that McKoy might attack a conviction on the ground of ineffective assistance of counsel, or because she had been deprived of particular testimony, wanted her situation to be reviewed by independent counsel to ensure that her decision to retain her trial attorney and forego his testimony was knowledgeable, intelligent and voluntary.

Assuming *arguendo* that this unusual step was appropriate, or at least not an abuse of the court's discretion, it did not warrant declaring a mistrial before the independent counsel was selected.[5] It was

---

**5.** We have substantial concern that the trial judge may have unduly intruded into the attorney-client relationship of McKoy's trial attorney and the defendant. Advised as early as January 24 of the potential problem, that the attorney had decided not to testify and that the defendant had agreed with the decision, the time for requiring independent legal advice was before trial, not at the virtual conclusion of trial. However, since we do not posit reversal on this ground, we need not examine the merits of the trial judge's concern that a conviction here would be reversed on sixth amendment "effective assistance of counsel" grounds. *Cf.*

open to the court to recess the trial, appoint counsel with instructions to confer promptly with McKoy, and leave it to the appointed counsel to determine whether a complete trial transcript was necessary to his rendition of advice. While it appears that a transcript was ordered and supplied to appointed counsel, there is no suggestion in the record that it was indispensable to an understanding of the trial or advising McKoy. Indeed, the issue was a simple one, capable of easy explanation. Seemingly, a recess for an hour or two, or overnight, was all that was required for a meaningful consultation between appointed counsel and McKoy, particularly since there was available on February 24 the transcript of Piatigorsky's testimony at the suppression hearing of February 17. Additionally, if appointed counsel did require trial transcript, there is no reason why it could not have been furnished within two or three days. Only if it then appeared that McKoy's earlier decision had not been knowledgeable and intelligent would it have been appropriate to consider declaring a mistrial.[6] As it developed, independent counsel's report to the court made it clear there would have been no reason for declaring a mistrial had there been such consultation during an ongoing trial.

Accordingly, we hold that no "manifest necessity" existed for declaring the mistrial and that the defendant's motion to dismiss the indictment must be granted. The order of the district court is reversed.

*Illinois v. Somerville,* 410 U.S. 458, 471, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973).

**6.** In *Dunkerley v. Hogan,* 579 F.2d 141, 147–48, the court noted that the trial judge could have granted a seven to ten days' continuance to allow defendant to recover from an illness.