646 F.2d 810
 Rooks E. CRAWFORD
v.
Peter J. FENTON, Superintendent of New Jersey State Prison, Rahway
Charles Cummings, Sheriff of Essex County, and The State of New Jersey
Appeal of the STATE OF NEW JERSEY.
 No. 80-1608.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 2, 1980.
Decided March 27, 1981.
Rehearing Denied April 23, 1981.
 
 John J. Degnan, Atty. Gen. of New Jersey, Trenton, N.J., for appellant; Donald S. Coburn, Essex County Prosecutor, Newark, N.J., of counsel; Richard R. Uslan (argued), Asst. Essex County Prosecutor, Newark, N.J., on brief.
 Stanley C. Van Ness, Public Defender, James A. Vigliotti (argued), Asst. Deputy Public Defender, Elizabeth, N.J., for appellee.
 Before ADAMS, GARTH and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge.
 
 
 1
 After three days of deliberation, the jury found defendant Rooks Edward Crawford guilty of conspiring to violate the narcotics laws of New Jersey. The state trial judge, however, believing that the jury's answers to special interrogatories were inconsistent with the guilty verdict, ordered the jury to continue its deliberations. After a day of further deliberation the jury, displaying confusion, asked to be released. The trial judge declared a mistrial over the defendants' objections, holding that there was a manifest necessity to do so.
 
 
 2
 On federal habeas review, the district court determined that the trial judge had abused his discretion in ruling that manifest necessity existed for the jury's discharge. The district court then held that the double jeopardy clause of the Fifth Amendment barred Crawford's retrial. Crawford v. Fenton, 490 F.Supp. 776 (D.N.J.1980). We disagree and reverse.
 
 I.
 
 3
 Rooks Edward Crawford was indicted on April 19, 1977 with conspiracy "to violate the provisions of the narcotics laws of the State of New Jersey, contrary to the provisions of N.J.S. 24:21-24."[1] On March 13, 1978, a jury trial for Crawford and his seven co-defendants began in the New Jersey Superior Court. The trial judge charged the jury on the morning of Tuesday, April 11, 1978. He requested that if the jury found any of the defendants guilty of conspiracy, it should answer supplemental questions concerning the scope of the conspiracy and the type and amount of controlled dangerous substance (CDS) involved.[2]
 
 
 4
 In explaining the verdict form to the jury, the trial judge said:
 
 
 5
 All right. As to the first count, you will first indicate whether any of the defendants are guilty or not guilty; the N.G. stands for not guilty, the G stands for guilty.
 
 
 6
 If you find any one of these defendants guilty then you are going to have to answer the next series of questions as to the scope of the conspiracy, whether it had to do with possession of controlled dangerous substances. If the answer is yes, check yes, if the answer is no, check no.
 
 
 7
 Possession with intent to distribute. If the answer is yes, check yes, if no, check no. If the conspiracy involved distribution of controlled dangerous substances, check yes or no. That's only if you find any of the defendants guilty of the conspiracy.
 
 
 8
 If you don't, you need not go to the series three questions.
 
 
 9
 Then, if you find the defendant guilty of a conspiracy, you will have to answer the next group of questions, that is, whether they conspired to possess, possess with intent to distribute, or distribute heroin, yes or no, cocaine, yes or no. That's not been marked, you better correct this form. All right, we will have the form corrected, there will be a yes or no placed after cocaine.
 
 
 10
 Then if it's cocaine, you will indicate if it's less than one ounce, but at least 3.5 grams pure, free base, or less than one ounce (sic) or more than one ounce but less than 3.5 grams pure, free base.
 
 
 11
 The record does not disclose the judge's reason for presenting these interrogatories to the jury. Presumably they were introduced for sentencing purposes. See 5 NT at 12; State of New Jersey v. Wallace, No. 2825-76, slip op. at 5 (N.J.Super.Ct.Law Div.) (App. at 24). The punishment for violation of the conspiracy statute "may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the endeavor of conspiracy." N.J.Stat.Ann. § 24:21-24. Thus the length of the potential sentence would depend on whether the conspiracy only involved possession rather than possession with intent to distribute or distribution, and the amount and purity of the Schedule I or II narcotic drug involved.[3]
 
 
 12
 On Friday afternoon, April 14, the jury returned its verdict. Crawford and two other defendants were found guilty of conspiracy, four defendants were acquitted, and the jury was unable to reach a verdict as to the eighth defendant. In answering the interrogatories, the jury found that the guilty defendants had conspired to distribute a controlled dangerous substance (CDS) but had not conspired either to possess, or to possess with intent to distribute a CDS. The jury answered "No" to the question of whether the drug was heroin, and "No" to the question of whether the drug was cocaine. One defense attorney eventually brought to the court's attention that there was a possible inconsistency between the general verdict of guilty and the answers to the special interrogatories. The judge agreed, ordered the jury back, and the following dialogue ensued:
 
 
 13
 THE COURT: I have your verdict form in which you indicate you have found three defendants guilty of conspiracy, then you go on to say, and I ask you this question, now you are to consider the controlled dangerous substance involved as well as the amount, and you say no heroin was involved and no cocaine.
 
 
 14
 Your verdict is in error. You are to go back and deliberate and determine for me whether that verdict is correct or not. You go back to your deliberations. Your verdict form will be sent back.
 
 
 15
 VOICES: We don't understand.
 
 
 16
 THE COURT: You don't understand what? All right. I will send the jury back. You send me such note as you see fit, ladies and gentlemen. Give me the verdict form.
 
 
 17
 (4 NT at 21)[4]
 
 
 18
 Counsel for Crawford and the other defendants found guilty moved that the verdict be set aside as against the weight of the evidence, relying on the jury's answer that the conspiracy had involved neither heroin nor cocaine. (4 NT at 22). One defense counsel moved for a mistrial and requested that the verdicts be set aside on the ground that they were inconsistent. The trial judge never ruled on these motions.
 
 
 19
 The jury returned at four o'clock with a corrected verdict form. Its only "correction" was to change its answer from "Yes" to "No" as to whether the scope of the conspiracy related to distribution of a controlled dangerous substance (4 NT at 29). Thus, with this change made to the verdict form, the jury had then found certain defendants guilty of conspiring to violate the narcotics laws, but in defining the scope of that conspiracy had not found these defendants guilty of either possessing or possessing with intent to distribute or distributing a controlled dangerous substance. Since the jury had already found that the conspiracy did not involve possession, or possession with intent to distribute, its "corrected" finding created still another inconsistency. The judge then explained to the jury that the jury had to determine which law the defendants conspired to violate and the identity and quantity of the drug involved. The jury then retired.
 
 
 20
 The jury soon sent back a note indicating that it did not know whether the conspiracy concerned heroin or cocaine:
 
 
 21
 There has been no testimony as to what any of the codes were. It was not established whether or not pants was cocaine or heroin; coats was cocaine or heroin, and so forth. Therefore it would not be fair to answer that question. We would be guessing. Thank you.
 
 
 22
 (4 NT at 35).[5] Defense counsel then requested a directed verdict of acquittal. The state responded by asserting that the jury had determined that the conspiracy concerned a controlled substance but the jury did not know which substance was involved. The state then asked the court to rephrase the interrogatories so as to seek an answer as to the amount of the substance involved, but not its identity. (4 NT at 36-40).
 
 
 23
 The judge failed to heed either the prosecutor's or the defense attorneys' requests, but instead again instructed the jury that if the defendants were guilty, the jury had to find whether they conspired to possess, possess with intent to distribute, or to distribute a CDS, and whether the CDS was heroin or cocaine. (4 NT at 42-43). He then sent the jury back to deliberate.
 
 
 24
 The defendants' attorneys protested that the new charge directed the jury to arrive at a consistent guilty plea and did not ask the jury to consider whether the defendants were innocent. They claimed that the findings demonstrated that any conspiracy may have had nothing to do with a controlled substance and again asked for a directed verdict of acquittal. While the parties were debating one juror sent out a note stating that it would cause him a great hardship to attend jury deliberations on Saturday. At 5:10 p. m. the jury sent a note to the judge stating that the jurors wanted to go home. A few minutes later, a jury note revealed that a few jurors would reverse their guilty verdicts to not guilty. (4 NT at 60).
 
 
 25
 The trial judge then stated, that if asked, he would have charged the jury that if it did not find which substance was the subject of the conspiracy, it should find the defendants not guilty. (4 NT at 61). He did not so charge, however, because no defendant asked for such an instruction. Nor, thereafter did any of the defendants make such a request. Discussion among the judge and the lawyers continued. One defense attorney observing the jury's confusion, expressed fear that it would be intimidated into returning a guilty verdict. (4 NT at 64).[6] The trial court then ruled on motions for judgment of acquittal, denying them. (4 NT at 69). The trial judge indicated that he was considering declaring a mistrial if no one objected. Defense counsel expressed their preference that the jury be allowed to continue deliberations. The judge acceded to their request.
 
 
 26
 The jury then asked to "hear the testimony on the chemist" and "any testimony that would help determine what the codes would mean." (4 NT at 71). It was estimated that it would take at least four days to read this testimony. (4 NT at 74-75). While counsel were discussing when to have the testimony read to the jury, the jury sent out another note. This note read, "We did not consider questions 1 through 5 (of Appendix B) in our guilty verdict which could have changed our verdict to not guilty." (4 NT at 75.) The trial court took no action in response to this note. Thereafter, some testimony was read, but the jurors were soon excused so that they could eat dinner (at 8:30 p. m., the dinner having been delayed). After dinner, the jurors requested that they be allowed to go home:
 
 
 27
 We have been here 12 hours. A lot of us are very tired and cannot concentrate. We ask you to please let us go home. We would like to know what your comments are on our other notes we sent you earlier.
 
 
 28
 (4 NT at 82). At that stage, the judge stated his intention to discharge the jury. Defense counsel asked the court to allow the jury to press on. The court honored their request, excused the jurors, and asked them to return at nine o'clock the next morning (Saturday).
 
 
 29
 On Saturday morning the jury was again read testimony, until it expressed a desire not to hear any more (5 NT at 2). The jury withdrew, and the defense attorneys again argued for a judgment of acquittal. The jury then sent out another note:
 
 
 30
 Your Honor, after serious thought we feel we cannot continue with this trial because:
 
 
 31
 (1) we did not consider questions 1 through 5 in reaching any verdict.
 
 
 32
 (2) we feel that the types and amounts of drugs found in various places is not necessarily the same types and amounts conspired to be possessed, distributed, etc. by the defendants in our case.
 
 
 33
 Additionally, because of the above, 5 jurors feel that they would reverse their guilty verdicts.
 
 
 34
 (5 NT at 6-7). The defense attorneys again asked that the jury be allowed to press on; the prosecutor responded by commenting that the jury was "hopelessly deadlocked" and "becoming more and more confused " The judge, concluding that there was a manifest necessity to declare a mistrial did so over the objection of the defendants at 11:35 a. m., Saturday April 15, 1978. At the time the mistrial was declared, the jury had communicated with the trial judge in notes, a total of twenty-four times.
 
 
 35
 Subsequent to the trial, Crawford moved to dismiss the indictment on double jeopardy grounds. The New Jersey Superior Court denied Crawford relief, State v. Wallace, supra, and his application for leave to appeal from that decision was denied by the Appellate Division of the New Jersey Superior Court and the New Jersey Supreme Court. Crawford then filed the present habeas corpus petition in the United States District Court for the District of New Jersey.
 
 
 36
 The district court held that double jeopardy prevented the retrial of Crawford, and granted his petition for the issuance of the writ. In so holding the district court distinguished between a hung jury and a jury whose verdict was in error. The district court properly characterized the test by which a hung jury's deadlock is measured, by stating "that when a mistrial is declared because of a hung jury, the trial judge's decision to end deliberation is accorded great respect." 490 F.Supp. at 783. By contrast, the district court reasoned that when considering a verdict "in error" a "more demanding standard of review was appropriate." Id. at 784. It stated that alternatives to mistrial had to be considered and if "obvious and adequate alternatives to aborting the trial were disregarded, this suggests the trial judge acted unjustifiably." Id. at 785, quoting Harris v. Young, 607 F.2d 1081, 1085 n.4 (4th Cir. 1979), cert. denied, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980). Here, the district court reasoned that a clear charge to the jury may have dissipated the jury's confusion. The district court then determined that a better alternative to a mistrial was available (i. e. the "clear charge"), and held that the trial judge had abused his discretion in finding that manifest necessity existed for declaring a mistrial.
 
 II.
 
 37
 The protection of the double jeopardy clause of the Fifth Amendment attaches before a judgment becomes final. It not only prohibits a second trial following an acquittal, but it also protects a defendant's "valued right to have his trial completed by a particular tribunal." United States v. Jorn, 400 U.S. 470, 484, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (plurality opinion of Harlan, J.) quoted in Arizona v. Washington, 434 U.S. 497, 503, 98 S.Ct. 824, 829, 54 L.Ed.2d 717 (1978). Consequently if a mistrial is declared because the state, wishing to decrease the risk of an acquittal, desires the opportunity to "buttress weaknesses in (its) evidence," Id. at 507, 98 S.Ct. at 831, the double jeopardy clause prevents a retrial. A second prosecution: "increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted." Id. at 503-04, 98 S.Ct. at 829 (footnotes omitted).
 
 
 38
 Nevertheless, it has long been held that the declaration of a mistrial sua sponte by a trial court does not automatically bar a future trial for the same offense. The Supreme Court wrote in Arizona v. Washington :
 
 
 39
 "(B)ecause of the variety of circumstances that may make it necessary to discharge a jury before a trial is concluded, and because those circumstances do not invariably create unfairness to the accused, his valued right to have the trial conducted by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury."
 
 
 40
 Id. at 505, 98 S.Ct. at 830. The standard that must be met in order to avoid the bar of double jeopardy was first set forth by Justice Story in United States v. Perez, 9 Wheat. (22 U.S.) 579, 580, 6 L.Ed. 165 (1824):
 
 
 41
 The prisoner has not been convicted or acquitted, and may again be put upon his defense. We think that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes But, after all, they have the right to order the discharge, and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this as in other cases, upon the responsibility of the judges, under their oaths of office.
 
 
 42
 Id. at 580 (emphasis added).
 
 
 43
 The state here has the burden of showing that the trial court did not abuse its discretion in finding manifest necessity for a mistrial.
 
 
 44
 Arizona v. Washington teaches us that the term "necessity" as it is used in the manifest necessity test cannot be mechanically applied, but must rather relate to the particular circumstances giving rise to the mistrial. Id. 434 U.S. at 506, 98 S.Ct. at 830. If, for example, a mistrial has been granted in order to allow the state to achieve a tactical advantage, then the strictest scrutiny is appropriate. Id. at 509, 98 S.Ct. at 832. On the other hand, when a trial judge declares a mistrial because the jury was unable to reach a verdict, broad discretion must be allowed. The Court explained in Arizona that
 
 
 45
 (I)n this situation there are especially compelling reasons for allowing the trial judge to exercise broad discretion in deciding whether or not "manifest necessity" justifies a discharge of the jury. On the one hand, if he discharges the jury when further deliberations may produce a fair verdict, the defendant is deprived of his "valued right to have his trial completed by a particular tribunal." But if he fails to discharge a jury which is unable to reach a verdict after protracted and exhausting deliberations, there exists a significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors. If retrial of the defendant were barred whenever an appellate court views the "necessity" for a mistrial differently from the trial judge, there would be a danger that the latter, cognizant of the serious societal consequences of an erroneous ruling, would employ coercive means to break the apparent deadlock. Such a rule would frustrate the public interest in just judgments. The trial judge's decision to declare a mistrial when he considers the jury deadlocked is therefore accorded great deference by a reviewing court.
 
 
 46
 Arizona v. Washington, supra, 434 U.S. at 509-10, 98 S.Ct. at 832 (footnotes omitted).
 
 
 47
 The circumstances giving rise to a mistrial in this case are closer to the circumstances found in a jury deadlock situation than the circumstances that are present when the state has sought to obtain a tactical advantage or has engaged in misconduct.[7] In both the deadlocked jury situation and in the situation here, a jury has been unable to arrive at a satisfactory verdict.[8] In both of these contexts, resolution can be achieved through further jury deliberations, but in both circumstances there is a danger that inherent pressures of the particular situation rather than the jurors' individual judgments, may result in each of the juries reaching unanimous and consistent verdicts. We thus conclude that the relevant standard of review to employ here is the same as the test utilized when reviewing mistrials in hung jury cases. We will afford great deference to the trial court's discretion.
 
 
 48
 We recognize that the district court did not utilize this standard in analyzing Crawford's application. Instead the district court looked to the availability of alternatives as an independent test of manifest necessity.
 
 
 49
 Under the district court's analysis, if an alternative to a mistrial existed (in this case an unsought additional charge to the jury) and that alternative was not exercised, then the grant of a mistrial would bar a subsequent prosecution of the defendant. The district court does not cite any authority which establishes such a standard. The cases cited, United States v. McKoy, 591 F.2d 218, 222 (3d Cir. 1979); United States ex rel. Russo v. Superior Court of New Jersey, 483 F.2d 7, 14 (3d Cir.), cert. denied, 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973); United States v. Tinney, 473 F.2d 1085, 1089 (3d Cir.), cert. denied, 412 U.S. 928, 93 S.Ct. 2752, 37 L.Ed.2d 156 (1973), do speak of alternatives, but the alternatives to which they refer are not independent measures of the district court's discretion. Rather, they speak only of an available alternative as a factor to consider in determining whether a manifest necessity for a mistrial exists.[9] Thus, we are not persuaded by Crawford's arguments which are based on the district court's analysis.
 
 
 50
 Having concluded that broad deference must be given to the trial judge's discretion, it follows from an examination of this record that the trial judge did not abuse his discretion when he discharged the jury. It had taken the jury three days to arrive at its initial verdict. When informed that its first verdict was in error, the jury did not appear to understand why it had erred. This confusion apparently continued unabated. In its day of further deliberation the jury never resolved the initial inconsistency between the guilty verdict which it had returned, and the special interrogatories which it had answered. Its only accomplishment was to compound that situation by changing its original answers to the interrogatories so that still another inconsistency surfaced. By Friday night, the fourth night of deliberation, it appeared that some jurors wished to change their vote from guilty to not guilty. By Saturday morning apparently five jurors stated that they would reverse their guilty "verdicts" and vote to acquit Crawford and his co-defendants. At that point, after more than four days of deliberation, the jury informed the judge that it did not feel it could continue. This last day of additional deliberation had not resulted in the jury reaching a consistent and unanimous verdict.
 
 
 51
 The jury during this period of time had become tired and restless. Even counsel for one of the defendants noted that the jury appeared too tired to continue. On Friday night the trial court remarked that to force the jury to deliberate any further would constitute "cruel and unusual punishment." (4 NT at 84-85). Any fair review of the events preceding the declaration of the mistrial discloses beyond all question that the jurors were fatigued, frustrated (they had complained about not receiving satisfactory answers to their previous communications), unable to concentrate, unwilling to guess, and persistent in their demands to return home and be relieved from their service as jurors. The trial judge in finding manifest necessity, recognized this situation, and explicitly took into account the length of time that the jury had been deliberating and the jury's declared inability to arrive at a verdict.[10] Thus, a real possibility existed that a consistent and unanimous verdict would be the product of the confusion and coercion inherent in the situation, rather than a product of the jurors' individual judgments. This very real possibility, which was perceived and expressed by the trial court, satisfies us on our reading of the record, that the trial court did not abuse its discretion in finding that a manifest necessity existed for a mistrial.
 
 
 52
 As we have previously observed, the district court, in holding that the trial court abused its discretion, emphasized that the trial court had failed to consider less drastic alternatives. According to the district court the trial court should have charged the jury that if it could not determine which controlled substance was involved, it should acquit the defendants. Crawford v. Fenton, supra, 490 F.Supp. at 485-86. The district court pointed out that the trial court had considered making such a charge. (4 NT at 61).
 
 
 53
 We are not persuaded that the availability of this alternative requires us to hold that the trial court abused its discretion. First, as we have noted, the district court's review was far too strict, and one which finds no support in our decisions. We have already stated that the circumstances which surrounded the declaration of a mistrial here, require the same deference to the trial court's discretion which is employed in a hung jury case.
 
 
 54
 Second, we are not convinced that the "alternative" to a mistrial which was seized upon by the district court as the basis for its ruling, was obvious and adequate.[11] The district court held that the judge should have charged the jury, that the jury should acquit the defendants if it could not determine which controlled substance was involved in their offenses. It is still unclear to us (see note 4 supra) that New Jersey law requires a jury to determine the exact identity of a CDS. Moreover, the lack of obviousness and adequacy of the charge in question is highlighted by the dissenting opinion which like this opinion is unable to assess the propriety of the proposed alternative charge. Indeed the dissent refers to "a proper instruction covering New Jersey law whatever it may be," (dissenting op. at 29) and suggests still another charge involving "general acquittal instructions" instead of the "alternative" charge which formed the predicate of the district court's holding. To this extent apparently the dissent agrees with us that the "obvious and adequate alternative" to which the district court referred actually may be an incorrect statement of New Jersey law.
 
 
 55
 In any event by reason of our disposition, we need not decide that issue. We observe, however, that even defense counsel never sought such a charge from the trial court although the court had alerted counsel to that possibility in discussing the jury's verdict. This circumstance, as well, undermines any conclusion that that charge was obvious and adequate.
 
 III.
 
 56
 We have concluded that the particular circumstances of this case require, on review, that we grant broad deference to the trial judge's determination. The record not only discloses the exercise of that discretion, but it furnishes ample support for the trial judge's ruling that manifest necessity existed for the declaration of a mistrial. Accordingly, we hold that the trial judge did not abuse his discretion in ordering an end to Crawford's trial. In so doing he did not trench upon Crawford's Fifth Amendment right to be free from double jeopardy.
 
 
 57
 We will therefore reverse the March 27, 1980 order of the district court which granted Crawford's petition for a writ of habeas corpus.
 
 APPENDIX A
 
 58
 24:21-19. Prohibited acts A. Manufacturing, distributing, or dispensing Penalties
 
 
 59
 a. Except as authorized by this act, it shall be unlawful for any person knowingly or intentionally:
 
 
 60
 (1) To manufacture, distribute, or dispense, or to possess or have under his control with intent to manufacture, distribute, or dispense, a controlled dangerous substance; or
 
 
 61
 (2) To create, distribute, or possess or have under his control with intent to distribute, a counterfeit controlled dangerous substance.
 
 
 62
 b. Any person who violates subsection a. with respect to:
 
 
 63
 (1) A substance, in a quantity of less than one ounce including any adulterants or dilutants, classified in Schedules I or II which is a narcotic drug, or in a quantity of 1 ounce or more with there being included less than 3.5 grams of the pure free base Schedule I or II narcotic drug, is guilty of a high misdemeanor and shall be punished by imprisonment for not more than 12 years, a fine of not more than $25,000.00, or both; or
 
 
 64
 (2) A substance, in a quantity of one ounce or more including any adulterants or dilutants, classified in Schedules I or II which is a narcotic drug, provided that there are included at least 3.5 grams of the pure free base Schedule I or II narcotic drug, is guilty of a high misdemeanor and shall be punished by imprisonment for up to life, a fine of not more than $25,000.00, or both; or
 
 
 65
 and
 
 
 66
 24:21-20. Prohibited acts B. Possession, use or being under influence Penaltiesa. It is unlawful for any person, knowingly or intentionally, to obtain, or to possess, actually or constructively, a controlled dangerous substance unless such substance was obtained directly, or pursuant to a valid prescription or order from a practitioner, while acting in the course of his professional practice, or except as otherwise authorized by this act. Any person who violates this section with respect to:
 
 
 67
 (1) A substance, in a quantity of less than 1 ounce including any adulterants or dilutants,, classified in Schedule I or II which is a narcotic drug, or in a quantity of 1 ounce or more with there being included less than 3.5 grams of the pure free base Schedule I or II narcotic drug, and any other controlled dangerous substance classified in Schedule I, II, III or IV is guilty of a high misdemeanor and shall be punished by imprisonment for not more than 5 years, a fine of not more than $15,000.00, or both, except as provided in subsection a. (4) below;
 
 
 68
 (2) A substance, in a quantity of 1 ounce or more including any adulterants or dilutants, classified in Schedule I or II which is a narcotic drug, provided that there are included at least 3.5 grams of the pure free base Schedule I or II narcotic drug, is guilty of a high misdemeanor and shall be punished by imprisonment for not more than 7 years, a fine of not more than $15,000.00, or both;
 
 
 69
 (footnotes omitted)
 
 APPENDIX B
 
 70
 VERDICT FORM Indictment No. 2825-76 1978 First Count CONSPIRACY TO VIOLATE THE NARCOTICS LAWS We, the jury, find as follows:
 
 
 71
 ROBERT WALLACE NG G
WILLIAM SALTERS NG G
EDWARD CRAWFORD NG G
WENDELL CLAYTON NG G
JAMES SYKES, JR. NG G
GARRISON GREGORY NG G
JESSE JOHNSON NG G
ARTHUR JOHNSON NG G
 
 
 72
 If you find any of the defendants Guilty of Conspiracy to Violate the Narcotics Laws, please answer the following questions:
 
 As to the scope of the Conspiracy:
 1. Possession of a Controlled
 Dangerous Substance Yes No
 2. Possession with intent to
 
 73
 distribute a Controlled Dangerous
 
 Substance Yes No
 3. Distribution of a Controlled
 Dangerous Substance Yes No
 
 74
 Now you are to consider the controlled dangerous substance involved as well as the amount
 
 
 75
 4. Heroin Yes No
 
 5. Cocaine
 
 76
 a. Less than 1 ounce, but at
 
 
 77
 least 3.5 grams pure free
 
 
 78
 base Yes No
 
 
 79
 b. Less than 1 ounce, or more
 
 
 80
 than 1 ounce but less than
 
 3.5 grams pure free base Yes No
 
 81
 SLOVITER, Circuit Judge, dissenting.
 
 
 82
 I respectfully dissent from the holding of the majority. I would affirm the decision of Judge Lacey that retrial of petitioner was barred by the double jeopardy clause because the trial judge failed to consider alternatives less drastic than the mistrial. I believe the majority's holding departs from our prior decisions establishing the requirements for use of the doctrine of manifest necessity to justify declaration of a mistrial.
 
 
 83
 I agree with the majority that the circumstances in this case more closely resemble those in a jury deadlock situation than in an alleged prosecutorial misconduct situation, and that therefore we are presented with a decision largely committed to the discretion of the trial court. However, as the district court recognized, even in that situation, the trial judge must determine whether there were any alternatives to the declaration of a mistrial. I believe the majority has effectively repudiated the teaching of our earlier cases which hold that "the trial judge (has) a duty to exhaust all other reasonable possibilities before deciding to foreclose a defendant's option to proceed The scrupulous exercise of that discretion means that he must seek out and consider all avenues of cure to avoid trial abortion." United States v. Tinney, 473 F.2d 1085, 1089 (3d Cir.), cert. denied, 412 U.S. 928, 93 S.Ct. 2752, 37 L.Ed.2d 156 (1973). Since I believe that the trial court ignored the "simple and obvious alternative()", United States v. MacQueen, 596 F.2d 76, 83 (2d Cir. 1979), of reinstructing the jury about the possibility of acquitting the defendants, I would hold that the grant of a mistrial was not manifestly necessary and hence violated petitioner's "valued right to have his trial completed by a particular tribunal " Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949), quoted in Arizona v. Washington, 434 U.S. 497, 503, 98 S.Ct. 824, 829, 54 L.Ed.2d 717 (1978).[1] Accordingly, I would affirm the judgment of the district court granting the petition for habeas corpus.
 
 
 84
 As the majority states, the standard governing the trial judge's declaration of a mistrial over defendant's objection is that "there is a manifest necessity for the act " United States v. Perez, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824). See also Arizona v. Washington, 434 U.S. at 505-06, 98 S.Ct. at 830-831; United States v. Leppo, 641 F.2d 149 at 152 (3d Cir. 1981). When a mistrial is declared, it is the burden of the state to "shoulder the (heavy) burden of justifying the mistrial if (it) is to avoid the double jeopardy bar." Arizona v. Washington, 434 U.S. at 505, 98 S.Ct. at 830. It is of course apparent that the word "necessity" cannot be interpreted literally;[2] nevertheless we should not uphold a trial court's discretionary determination that manifest necessity existed for a mistrial where a simple jury instruction might have produced an acceptable verdict.
 
 
 85
 The obligation of trial judges to consider alternatives before declaring a mistrial is evident from the decision in United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971). In that case, a tax fraud case against the preparer of tax returns, the trial judge abruptly discharged the jury because the judge believed that the defendant's customers who were going to testify had not been adequately warned of their own constitutional rights. The Supreme Court found the declaration of a mistrial to have been improper, primarily because it was "apparent from the record that no consideration was given to the possibility of a trial continuance " Id. at 487, 91 S.Ct. at 558. The subsequent holdings of this court follow directly from the Jorn case. We have frequently referred to the requirement that the trial court consider alternatives before granting a mistrial over defendant's objection. I believe that the majority errs in interpreting our recent cases as "speak(ing) only of an available alternative as a factor to consider in determining whether a manifest necessity for a mistrial exists." at 818. Instead, consideration of those cases makes it clear that unless alternatives have been considered, the trial court may not find manifest necessity for a mistrial.
 
 
 86
 In United States v. McKoy, 591 F.2d 218 (3d Cir. 1979), the trial judge had declared a mistrial over defendant's objection because the judge wanted the defendant to consult with independent counsel about whether her attorney should testify in her behalf as an eyewitness or continue to represent her. After the judge declared a mistrial, defendant consulted with appointed counsel who reported to the court that defendant had made a knowing and intelligent choice to dispense with her attorney's testimony. The court then reset the case for trial with the same trial attorney representing defendant. On appeal, we agreed with defendant's claim that the retrial violated her double jeopardy rights. Our discussion of the importance of considering alternatives there is equally applicable here:Under the Court's analysis in Jorn, supra, the government generally must demonstrate that, under the circumstances confronting the trial judge, he had no alternative to the declaration of a mistrial. 400 U.S. at 487, 91 S.Ct. 547. See also Arizona v. Washington, supra, 434 U.S. at 515-16, 98 S.Ct. 824; and only by considering and exhausting all other possibilities can the judge ensure that the defendant has received the full protection of the Double Jeopardy Clause. In reviewing the decision of the trial court, our duty is to see that alternatives to declaring a mistrial were completely canvassed.
 
 
 87
 591 F.2d at 222. See also United States v. Tinney, 473 F.2d at 1089 (failure to utilize reasonable and obvious alternative of granting a continuance before aborting the trial constituted an abuse of discretion). Other courts have also required trial judges to fully consider alternatives. See, e. g., Harris v. Young, 607 F.2d 1081, 1085-86 (4th Cir. 1979), cert. denied, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980); United States v. Pierce, 593 F.2d 415, 417 (1st Cir. 1979); United States v. Sanders, 591 F.2d 1293, 1299 (9th Cir. 1979); United States v. Lynch, 598 F.2d 132, 136 (D.C.Cir.1978), cert. denied, 440 U.S. 939, 99 S.Ct. 1287, 59 L.Ed.2d 498 (1979); Dunkerley v. Hogan, 579 F.2d 141, 147-148 (2d Cir. 1978), cert. denied, 439 U.S. 1090, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979); United States v. Kin Ping Cheung, 485 F.2d 689, 691 (5th Cir. 1973).
 
 
 88
 I believe a requirement that the trial court must consider reasonable alternatives before exercising its discretion to declare a mistrial does not conflict with the Supreme Court's holding in Arizona v. Washington that the trial court's decision to grant a mistrial must be accorded great deference where the basis of the declaration stems from the trial proceedings themselves. 434 U.S. at 510-14, 98 S.Ct. at 832-834. In Arizona v. Washington, however, the trial court heard extensive argument on the prosecution's motion for a mistrial, including the prosecutor's contention that the prejudice to the jury caused by the defense counsel's improper opening statement could not be cured by cautionary instructions. Id. at 500-01, 514-15 n.34, 98 S.Ct. at 827-828, 834-835 n.34. Thus, although the trial court did not expressly state that it had considered and rejected as inadequate any alternative solutions, it may fairly be concluded that the court had determined that the alternative of cautionary instructions would not have protected the state's right to a "full and fair opportunity to present (its) evidence to an impartial jury." Id. at 505, 98 S.Ct. at 830. (footnote omitted).
 
 
 89
 In the case sub judice, the only indication given by the trial judge as to why he decided not to give a new instruction to the jury after he himself alluded to the possibility was that the new instruction had not been requested. As I note infra, this is an insufficient reason to justify failure to attempt an alternative to the declaration of a mistrial. Although Arizona v. Washington holds that an on-the-record discussion of alternatives and reasons for rejecting them is not required, here the fact that the trial judge stated that he did not give new instructions because they were not requested indicates that he failed to pursue the availability of alternatives. Where no harm could result from the repetition or clarification of instructions, it is difficult to justify the failure to reinstruct. Again, this case is distinguishable from Arizona v. Washington, where reliance on cautionary instructions "(would) not necessarily remove the risk of bias that may be created by improper argument." Id. at 513, 98 S.Ct. at 834. Thus, I believe this case is governed by the rule that the trial judge's discretionary power to declare a mistrial over defendant's objection can only be exercised when no reasonable alternatives to this course of action exist. In fact United States v. McKoy was decided after Arizona v. Washington, and we reaffirmed the vitality of our previously enunciated rule to this effect. 591 F.2d at 222.
 
 
 90
 There are two factors on which the majority apparently relies for its conclusion that the trial judge did not abuse his discretion in the instant case: first, that the acquittal instruction might not have been proper under New Jersey law; and second, that the instruction was never requested by the defendant. at 819.
 
 
 91
 The district court held that the trial judge improperly neglected to consider the alternative of instructing the jury that it should acquit the defendants if it could not determine which controlled substance was involved in their offenses. The majority indicates it is not satisfied that New Jersey law requires a jury to determine the exact identity of the controlled dangerous substance and therefore concludes that the suggested instruction might be an inaccurate statement of New Jersey law. at 819. I believe that the instruction which should have been given need not have focused on the failure to identify the CDS, but, in the unusual circumstances of this case, should have repeated the general acquittal instructions. While ordinarily such a course might not be required, in this case there were notes from the jury stating that it was unable to determine what CDS was involved, a note that "there are a few people who would like to reverse their verdict of guilty to not guilty", a note stating "We did not consider question 1 thru 5 in our guilty verdicts which could have changed our verdicts to not guilty," and yet another stating "5 jurors feel that they would reverse their guilty verdicts." I believe these notes should have prompted the trial court to repeat its general acquittal instruction. In this way, if the jury had decided that its uncertainty regarding the identity of the CDS constituted a reasonable doubt as to defendant's guilt, it would have been reminded of its responsibility to acquit.[3]
 
 
 92
 Furthermore, since the jury appears to have been confused about what to do with a belief of guilt coupled with an uncertainty about the type of CDS involved, it follows that a proper instruction covering New Jersey law whatever it may be might well have assisted the jury in reaching an acceptable verdict.
 
 
 93
 The second factor referred to by the majority was the defendant's failure to request new instructions. While ordinarily litigants cannot complain of the trial court's failure to take certain action in the absence of a specific request that it do so, the stringent showing necessary to declare a mistrial convinces me that, at least in the circumstances of this case,[4] defendant's failure specifically to request new instructions does not defeat his claim.
 
 
 94
 The cases repeatedly refer to the trial judge's responsibility to consider alternatives without restricting this consideration to alternatives specifically requested. Thus in Jorn the Supreme Court held that it was error for the trial judge to have granted a mistrial instead of merely granting a continuance, notwithstanding the failure of defendant to have requested a continuance. 400 U.S. at 487, 91 S.Ct. at 558. As we stated in United States v. McKoy, "only by considering and exhausting all other possibilities can the judge ensure that the defendant has received the full protection of the Double Jeopardy Clause." 591 F.2d at 222 (emphasis added). Similarly in United States v. Tinney, we noted that "(t)he scrupulous exercise of (the) discretion (to grant a mistrial) means that (the trial judge ) must seek out and consider all avenues of cure to avoid trial abortion." 473 F.2d at 1089 (emphasis added). See also United States v. Brahm, 459 F.2d 546, 550-51 (3d Cir.), cert. denied, 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972) (trial judge must "assure himself" that declaration of mistrial is necessary).
 
 
 95
 Because I believe that the majority ignores our controlling precedent and that its holding will create confusion as to the proper standard to be applied in the future, I dissent.
 
 
 
 [1]
 N.J.Stat.Ann. § 24:21-24 (Supp.1980) provides:
 Attempt, endeavor and conspiracy
 a. Any person who attempts, endeavors or conspires to commit any offense defined in this act is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the endeavor of conspiracy.
 The relevant portions of the underlying offenses, are found in N.J.Stat.Ann. §§ 24:21-19, 21-20, and are reproduced in Appendix A infra. In substance N.J.Stat.Ann. § 24:21-19 (Supp.1980) provides for various penalties for manufacturing, distributing or dispensing certain controlled substances in particular quantities. The penalties vary as to the amount and purity of the drug dispensed.
 Similarly N.J.Stat.Ann. 24:21-20 (Supp.1980) proscribes possession of controlled substances and details different penalties depending upon the amount and purity of the drug possessed.
 
 
 [2]
 The Verdict Form which the jury was to complete is reproduced as Appendix B to this opinion
 
 
 [3]
 See note 1 supra and Appendix A infra. The sentence would not depend upon whether the controlled dangerous substance (CDS) was cocaine or heroin. Although heroin is a Schedule I narcotic drug and cocaine is a Schedule II narcotic drug, see N.J.Stat.Ann. §§ 24:21-2, 21-5, 21-6 (Supp.1980), the statute treats both identically. Apparently, the trial court asked the jury to decide whether the CDS was cocaine or heroin only because it was undisputed that the amount of heroin involved was miniscule. 4 NT at 38, 55. By submitting these interrogatories, the trial court evidently did not intend to make the exact identity of the particular controlled substance an element of the crime
 
 
 [4]
 The state asserts in its supplemental brief that the verdict and the findings were not necessarily inconsistent. It claims that all the jury had to find was a conspiracy with regard to a controlled dangerous substance. It stresses that the jury did not have to identify the particular substance involved. Its brief points out that the indictment did not refer to a particular controlled substance. It would follow from this argument that the trial judge should have accepted the jury's verdict and answers as a determination that Crawford had conspired to distribute an unknown amount of either cocaine or heroin. The trial judge would then have had to assume that the amount of any particular controlled substance was too low to trigger the harsher punishment § 24:21-20(a)(2). Thus the state argues that the sentence would have been limited by the lesser punishment of § 24:21-20(a)(1). At oral argument Crawford did not disagree with this interpretation, nor did he respond to the state's supplemental brief
 We have some difficulty with the state's analysis. The trial judge apparently assumed that the jury had to identify the particular substance involved, see 4 NT at 61, although neither in his original charge, see 1 NT, nor by his special interrogatories did he seek to ascertain the exact identity of the CDS as an element of the crime. See note 3 supra. The New Jersey Superior Court in refusing to dismiss Crawford's indictment, State v. Wallace, No. 2825-70 (N.J.Super.Ct.Law Div.) (App. at 20) wrote: "the initial verdict form that came forth from the jury was certainly and definitely inconsistent in its findings because it made a determination of distribution of CDS but didn't make a determination as to the specific drugs involved." Id, slip op. at 12, App. at 31. We also note that the jury's answers appear to be ambiguous, since they can be read as stating that the substance involved was neither cocaine nor heroin, rather than either cocaine or heroin. The former interpretation would be inconsistent with the verdict. The state concedes that New Jersey law requires that a verdict be unambiguous. See generally State v. Greely, 95 A.2d 1, 11 N.J. 485 (1953). Thus we assume that the initial guilty verdict would not have been sustained.
 
 
 [5]
 The wording of the actual notes in this case differ in minor and insubstantial respects from the wording of the notes as reported in the transcript. We have cited to and will continue to cite to the transcript versions
 
 
 [6]
 Crawford's attorney, Mr. Brummell, did not have this perception
 
 
 [7]
 There is no indication here that the prosecutor desired a mistrial so that he could fill in the gaps of his case. In fact, he never requested the trial court to grant a mistrial
 
 
 [8]
 Here the jury did find Crawford guilty of conspiracy. The unsatisfactory aspect of the jury's verdict was the jury's inability to answer subsidiary questions in a fashion consistent with its general verdict
 Our research has disclosed no circumstance in which the declaration of a mistrial occurred after the jury had returned a unanimous verdict of guilty even though its verdict could be attacked as inconsistent. The cases cited involve declarations of mistrial prior to a jury verdict. See note 9 infra.
 We note that if the jury verdict had been accepted, Crawford would have been entitled, at most, to a new trial. Pipefitters Local Union No. 562 v. United States, 407 U.S. 385, 401 n.11, 92 S.Ct. 2247, 2257 n.11, 33 L.Ed.2d 11 (1972) (when special interrogatories are inconsistent with the general verdict, the petitioner "would still be entitled at best to a new trial, not acquittal.")
 
 
 [9]
 In United States v. McKoy, 591 F.2d 218, 222 (3d Cir. 1979), counsel for the defendant was also a witness. The trial judge declared a mistrial to allow the defendant to obtain the advice of other counsel, rather than utilizing the obvious and adequate option of ordering a recess
 In United States ex rel. Russo v. Superior Court of New Jersey, 483 F.2d 7, 14 (3d Cir.), cert. denied, 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973), the trial judge discharged the jury because he believed it to be exhausted. Yet there was no support in the record for this determination; the jury had never indicated it was exhausted; the trial judge never conferred with the defense counsel or the prosecutor about whether he should take this step; and there was no evidence that the jury was deadlocked and was unlikely to be able to reach a verdict. Id. at 17.
 In United States v. Tinney, 473 F.2d 1085, 1089 (3d Cir.), cert. denied, 412 U.S. 928, 93 S.Ct. 2752, 37 L.Ed.2d 156 (1973), rather than granting a short continuance to ascertain the reason for Tinney's absence, the trial judge in effect declared a mistrial when the defendant, who was delayed some few minutes by reason of an automobile breakdown, did not promptly appear for the last day of trial.
 The dissent apparently disagrees with our formulation that the existence of alternatives is only a factor to consider in determining whether manifest necessity for a mistrial exists. If the dissenting opinion has taken the position that all alternatives must be exhausted before a mistrial may be declared, (dissenting op. at p. 821), then there is an evident disagreement with the position that we have taken. If, however, all that the dissenting opinion asserts is that alternatives must be considered, (dissenting op. at p. 822), then there is little difference between our positions. A review of the cases to which the dissent makes reference, including those that we have discussed above and cases from other circuits, and the Supreme Court case of United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971), reveals that their holdings fall well within the boundaries of the mistrial standard that we have set forth. It is clear that the more obvious and adequate the alternative is, the greater the role it must play in the trial judge's discretionary determination of whether a manifest necessity exists to declare a mistrial. Conversely, the less obvious and adequate the alternative, the less compelling influence such an alternative need play in the trial judge's determination. Thus, there can be no question but that consideration of alternatives is required, but that consideration is not invariably of controlling significance. Each case of course turns on its particular facts, but none of the circumstances present in the cases cited by the dissent resemble the factual configuration of the present case.
 
 
 [10]
 The trial judge expressly declared that the identification of the drug and the determination of the quantities involved were required so he could "be in a position to make a determination of the nature of the punishment." (5 NT at 12). We express no view as to the advisability of combining the usual general verdict in a criminal case with specific interrogatories designed to satisfy the purposes of sentencing. We note only that the New Jersey Supreme Court has indicated that the use of special interrogatories are disfavored in criminal proceedings. See State v. Simon, 398 A.2d 861, 79 N.J. 191 (1979). We are not called upon here to determine how the provisions of N.J.Stat.Ann. 24:21-24 are to be implemented, although we have acknowledged in note 4, supra, one solution, not without its problems, which was advanced by the state in this particular case
 
 
 [11]
 The obvious and adequate alternative factor, and the role it plays in appellate review of mistrial rulings is clearly set forth in Harris v. Young, 607 F.2d 1081, 1085 n.4 (4th Cir. 1979), cert. denied, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980). In Harris no manifest necessity was found for a mistrial because the evidentiary problem which gave rise to the jury's discharge could readily have been resolved by normal trial sanctions without depriving Harris of his right to a verdict of that jury
 In analyzing the cases cited by the district court when it adhered to an independent "obvious and adequate alternative" standard, see note 9 supra, it is evident that the circumstances present in those cases did not give rise to manifest necessity for a mistrial. In McKoy, Russo and Tinney, the particular overriding circumstances which led to the mistrial could readily have been obviated without requiring the defendant to be subjected to a second trial with a different jury.
 
 
 [1]
 This right is derived from the double jeopardy clause of the Fifth Amendment. See United States v. Jorn, 400 U.S. 470, 484, 91 S.Ct. 547, 556, 27 L.Ed.2d 543 (1971)
 
 
 [2]
 As the English courts have recognized on the issue of mistrials in the hung jury context, "(t)his rule if taken literally seems to command the confinement of the jury till death if they do not agree " Winsor v. The Queen, L.R. 1 Q.B. 389, 394 (1866), quoted in Arizona v. Washington, 434 U.S. at 506 n.21, 98 S.Ct. at 831 n.21
 
 
 [3]
 This case is unlike United States v. MacQueen, 596 F.2d 76 (2d Cir. 1979), because the court there had explicitly determined that further reinstruction was unnecessary in light of the initial instructions and subsequent clarification
 
 
 [4]
 Defendant did object to the trial court's sua sponte decision to declare a mistrial and made repeated motions for a judgment of acquittal based on the jury's inability to identify the CDS or the scope of the conspiracy. Additionally, as the majority notes, the defense attorneys did object to one of the judge's requests to the jury for clarification, claiming that the new charge directed the jury to enter a guilty verdict and did not ask the jury to consider whether the defendants were innocent. at 814. See generally United States ex rel. Russo v. Superior Court of New Jersey, 483 F.2d 7, 17 (3d Cir. 1973) (overlooking defense counsel's failure to promptly object to grant of mistrial itself)