PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2306
_____

UNITED STATES OF AMERICA

v.

ABDUR RAHIM ISLAM and
SHAHIED DAWAN,
                    Appellants

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Criminal Nos. 2-20-cr-00045-001 and
2-20-cr-00045-002
District Judge: Honorable Gerald A. McHugh
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
on April 12, 2024

Before:  CHAGARES, *Chief Judge*, PORTER, and
SCIRICA, *Circuit Judges*.

(Filed: May 16, 2024)

Peter Goldberger
50 Rittenhouse Place
Ardmore, PA  19003

Joshua D. Hill
Eckert Seamans Cherin & Mellott
50 S 16th Street
Two Liberty Place, 22nd Floor
Philadelphia, PA  19102

    *Counsel for Appellant Abdur Rahim Islam*

Thomas O. Fitzpatrick
Mincey Fitzpatrick Ross
1650 Market Street
36th Floor
Philadelphia, PA  19103

    *Counsel for Appellant Shahied Dawan*

Mark B. Dubnoff
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA  19106

    *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

**SCIRICA**, *Circuit Judge*

Over the course of Abdur Rahim Islam and Shahied Dawan's nearly six-week-long trial, five original jurors were discharged and replaced by alternates. Then, one of the remaining twelve jurors contracted COVID-19. After Islam and Dawan refused to proceed with eleven jurors pursuant to Federal Rule of Criminal Procedure 23(b)(2), the District Court declared a mistrial based on manifest necessity.

Islam and Dawan moved to dismiss the indictment, arguing the Fifth Amendment's Double Jeopardy Clause barred their reprosecution. The District Court denied the motion. We hold the District Court's declaration of a mistrial was manifestly necessary, and so we will affirm as to Islam. We dismiss Dawan's appeal as moot.

I.

We briefly recite the facts of this "complicated and extensive" criminal prosecution. Dkt.[1] 516, at 1.

A.

On January 28, 2020, a federal grand jury returned a twenty-two count indictment against Defendants-Appellants Abdur Rahim Islam and Shahied Dawan, alongside co-defendants Kenyatta Johnson and Dawn Chavous. Islam

---

[1] "Dkt." citations refer to the docket before the District Court, *United States v. Abdur Rahim Islam et al.*, No. 20-CR-45 (GAM) (E.D. Pa.).

served as the chief executive officer of Universal Community Homes—an affordable housing developer, and Universal Education Companies—a charter school management company (Collectively, "Universal"). Dawan served as chief financial officer of University Community Homes and provided financial services to both companies. As alleged in the indictment, Islam and Dawan stole money from Universal by submitting fraudulent expense reimbursements and paid bribes to a member of the Milwaukee Public School Board. The indictment also alleged Islam and Dawan bribed Johnson, a Philadelphia City Councilmember, through his wife, Chavous, to benefit Islam and Dawan in two real estate ventures. Finally, the indictment alleged Islam prepared fraudulent income tax returns by failing to report bonuses received from Universal as taxable income.

The centerpiece of the indictment was a charge against Islam and Dawan for conspiracy to commit racketeering under 18 U.S.C. § 1962(d). The indictment also included six counts of wire fraud (against Islam and Dawan), one count of use of an interstate facility to further racketeering (also against Islam and Dawan), six counts of tax fraud (against Islam only), and eight counts of honest services wire fraud (six of which applied only to Islam and Dawan, and two of which applied to all four co-defendants).

Prior to trial, Johnson and Chavous moved to sever the only two charges that applied to them from the rest of the case, and the District Court granted the motion. Rather than hold separate trials, the District Court opted to proceed with a bifurcated trial, with all four defendants tried first on the honest services fraud charges, followed by a continuation of trial

4

before the same jury on the remaining charges against only Islam and Dawan.

When the case first went to trial in March 2022, the jury hung. Retrial began in September 2022. Jurors reported for service for the retrial on September 28, 2022 and were asked to commit to four-to-six weeks of service. The next day, twelve jurors and five alternates were sworn in. Seeking to avoid prejudice to Defendants, the District Court did not inform jurors of the bifurcated nature of the trial or that a second phase would begin immediately after they reached a verdict in the first phase.

Three jurors were discharged during Phase I of the trial. One juror was excused because of a scheduling conflict with her son's wedding. A second was discharged after becoming ill. A third was dismissed during Phase I deliberations after the District Court determined the juror's religious conviction was impairing her ability to deliberate impartially.

On November 2, 2022, five weeks after their service began,[2] the jury acquitted all four defendants of the honest services wire fraud charges, ending the prosecution of Johnson and Chavous. The District Court then informed the jurors and the two remaining alternates that their service was not completed and that they would need to consider additional charges against Islam and Dawan. The District Court noted that "after four days of difficult deliberation, jurors exhibited a strong negative reaction." J.A. 5. Nonetheless, testimony resumed the next day.

---

[2] Phase I was interrupted for one week when one of the defendants contracted COVID-19.

On the morning of November 3, 2022—the first day of Phase II—problems affecting two more jurors emerged. Juror 7 had previously informed the District Court that his partner's mother was severely ill and had entered hospice in Kentucky. She died during the night of November 2, and the juror expressed that he was "extraordinarily upset" and needed to travel to Kentucky. Dkt. 461, at 69:20-70:1. Finding him "distraught and distracted," the District Court discharged Juror 7 from service with no objection from counsel. *Id.* at 70:1-20.

Separately, Juror 6 informed the District Court that he had suffered a sudden death in his family and that a funeral was scheduled for the following morning. During a sidebar, the District Court informed counsel that Juror 6 had lost his 36-year-old first cousin in a "tragic and unexpected death." *Id.* at 70:21-71:3. After speaking with Juror 6, the District Court noted the "sudden and shocking death" had left him "very upset and emotionally distraught." *Id.* at 70:23-71:7. The District Court expressed hesitation at discharging Juror 6 because this would leave the jury with no more alternates. Seeking to maintain a constitutional mass of jurors, the District Court attempted to persuade Juror 6 to "hang in." *Id.* 71:4. The District Court also suggested Juror 6 could attend the memorial service the following morning and reconvene for trial in the afternoon, but the juror's "distraught" reaction led the District Court to conclude that the juror's emotional state was "genuine" and that this was "not a welcome suggestion." *Id.* at 72:3-15.

Defense counsel proposed the District Court adjourn for the following full day (Friday, November 4), allowing Juror 6 time for the funeral and three full days (including the weekend) to be with his family. The District Court raised several issues

6

with this plan. First, a Friday adjournment would prolong the service of the other jurors, who were "obviously disappointed" that the trial was still ongoing after nearly six weeks. *Id.* at 73:1-7. Second, the Government had previously requested the trial be adjourned on Election Day—Tuesday, November 8, 2022—as two of the attorneys prosecuting this case were also assigned to the U.S. Attorney's Office's election detail and had "important duties" to attend to on that day. *Id.* at 9:19-10:6. The District Court concluded that "the integrity of elections is a vitally-important national interest" and that it did not "see an alternative other than to release [the prosecutors] to perform those duties." *Id.* at 78:1-4. Based on the pace of trial, adjourning on Friday would thus mean that jurors would resume service on Monday, only to adjourn again on Tuesday—"another reality" that the District Court predicted "will spark potential rebellion on the part of the jurors." *Id.* at 76:7-13. Third, the District Court noted that the other jurors were aware of Juror 6's situation, creating a "credibility issue" with respect to the court's course of action. *Id.* at 77:7. Finally, the District Court expressed concern that even with an adjournment the next day, Juror 6 would have to participate in trial for the rest of the day on Thursday in his distraught and distracted state.

The District Court concluded in the face of "two bad alternatives" that it would choose the one that "most respects the integrity of the trial process": dismissing Juror 6. *Id.* at 79:1-3. Trial continued with the remaining twelve jurors the rest of Thursday, November 3 and Friday, November 4.

On Saturday, November 5, one of the remaining jurors—Juror 3—contacted the District Court and reported she had tested positive for COVID-19 and was symptomatic. The

District Court informed counsel and scheduled a conference call for the next day to discuss whether the parties would agree to proceed with an eleven-person jury pursuant to Federal Rule of Criminal Procedure 23(b)(2).[3] During the call, the District Court discussed the possibility of adjourning trial until the affected juror's recovery—at least a week under then-current CDC Guidelines. In doing so, the District Court noted that (1) another juror was also recently exposed to COVID-19, (2) two jurors had expressed concern that several fellow jurors were not being paid during their lengthy service, and (3) the jury foreperson had previously informed the District Court of a long-planned international family trip scheduled to begin in mid-November. Based on these considerations, as well as the "cumulative stress on the jurors" from the prolonged trial and difficult Phase I deliberations, the District Court concluded— without objection from the parties—that a five-day adjournment was not practical. Dkt. 463, at 5:23-6:8. Defense counsel informed the District Court that Islam and Dawan would not consent to proceeding with a jury of fewer than twelve people. Concluding there was "no alternative," the District Court found manifest necessity to declare a mistrial, *id.* at 7:3-7; 8:15-25, and scheduled the retrial for February 2023.

---

[3] "At any time before the verdict, the parties may, with the court's approval, stipulate in writing that: . . . a jury of fewer than 12 persons may return a verdict if the court finds it necessary to excuse a juror for good cause after the trial begins." Fed. R. Crim. P. 23(b)(2)(B).

B.

On December 21, 2022, Islam—later joined by Dawan—filed a motion to dismiss the indictment based on double jeopardy, arguing that there was no manifest necessity for the District Court to declare a mistrial. The District Court denied the motion on July 7, 2023.

Islam and Dawan subsequently filed this interlocutory appeal. On August 9, 2023, the District Court issued a memorandum concluding the interlocutory appeal was frivolous, allowing it to retain jurisdiction and proceed with the scheduled retrial during this appeal. *See United States v. Leppo*, 634 F.2d 101, 105 (3d Cir. 1980). Islam and Dawan then sought a stay of the District Court proceedings pending this appeal, which we denied.

On September 5, 2023, the grand jury returned a superseding indictment. The superseding indictment replaced the conspiracy to commit racketeering charge with a charge of conspiracy to defraud the United States, 18 U.S.C. § 371. The superseding indictment also omitted the charge of using an interstate facility to further racketeering, one of the six wire fraud charges, and the two honest services fraud charges on which all four co-defendants were acquitted in Phase I.

Retrial began on March 4, 2024. On March 20, 2024, the jury found Islam guilty on all counts and Dawan guilty only as to the charge of conspiracy to defraud the United States.

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction over Islam's appeal under 28 U.S.C. § 1291. *See Abney v. United States*, 431 U.S. 651, 662 (1977) ("[P]retrial orders rejecting claims of former jeopardy . . . constitute 'final decisions' and thus satisfy the jurisdictional prerequisites of § 1291.").

"We apply a mixed standard of review to a district court's decision on a motion to dismiss an indictment, exercising plenary review over legal conclusions and clear error review over factual findings." *United States v. Small*, 793 F.3d 350, 352 (3d Cir. 2015) (internal quotation marks omitted).

### A.

We first consider our jurisdiction over Dawan's appeal. *See United States v. Higgs*, 504 F.3d 456, 457 (3d Cir. 2007) ("This court has an obligation to inquire sua sponte into its own jurisdiction.").

As previously discussed, when this case was tried in November 2022, Dawan was acquitted of all counts in the indictment tried in Phase I before the mistrial occurred as to the racketeering conspiracy charge in Phase II. *See supra* II.A. But prior to retrial in March 2024, the racketeering charge was removed in the superseding indictment and replaced with a charge of conspiracy to defraud the United States—a different

10

offense.[4] The March 2024 retrial was the first time Dawan was charged with, tried on, and convicted of conspiracy to defraud the United States—thus posing no double jeopardy issues with that offense. *See United States v. Rigas*, 605 F.3d 194, 204 (3d Cir. 2010) (en banc) ("[T]he Double Jeopardy Clause prohibits repeat trials for the same offense, not for the same conduct. . . . [A] defendant generally may be subject to multiple prosecutions so long as each prosecution involves a different offense."); *see also Hudson v. United States*, 522 U.S. 93, 107 (1997) (Stevens, J., concurring) ("Unless a second proceeding involves the 'same offense' as the first, there is no double jeopardy.").

Furthermore, because the jury acquitted Dawan on all other counts, any remaining double jeopardy issues with respect to him are no longer live. We accordingly dismiss his appeal as moot. *See Kajmowicz v. Whitaker*, 42 F.4th 138, 152 n.11 (3d Cir. 2022) ("A case becomes moot . . . when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. In other words, once it becomes impossible for a court to grant any effectual relief whatever to the prevailing party, then we no longer have jurisdiction and must dismiss the case as moot." (citations and internal quotation marks omitted)).

Islam, in contrast, was convicted in March 2024 of multiple counts originally tried during the November 2022 trial—honest services wire fraud, wire fraud, and tax fraud. We

---

[4] No party contends that conspiracy to commit racketeering, 18 U.S.C. § 1962(d), and conspiracy to defraud the United States, 18 U.S.C. § 371, are the same offense.

11

accordingly evaluate the double jeopardy arguments as to him only.

## B.

The Double Jeopardy Clause of the Fifth Amendment "forbids that 'any person be subject for the same offence to be twice put in jeopardy of life or limb.'" *United States v. Rivera*, 384 F.3d 49, 53 (3d Cir. 2004) (quoting U.S. Const. amend. V). As relevant here, the clause protects a criminal defendant's "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter*, 336 U.S. 684, 689 (1949). The protections of the Double Jeopardy Clause, however, are not absolute. *See id.* at 688 (double jeopardy protection "does not mean that every time a defendant is put to trial before a competent tribunal he is entitled to go free if the trial fails to end in a final judgment"). Indeed, while a district court's power to declare a mistrial "ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes," *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824), the Double Jeopardy Clause will not bar prosecution where the mistrial is required by "manifest necessity," *United States v. Scott*, 437 U.S. 82, 93 (1978).

We have previously recognized that "[t]he realities of litigation preclude a precise definition of 'manifest necessity.'" *Rivera*, 384 F.3d at 55. "[T]hose words do not describe a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge." *Arizona v. Washington*, 434 U.S. 497, 506 (1978). Moreover, "'necessity' cannot be interpreted literally; instead, . . . we assume that there are degrees of necessity and we require a 'high degree' before concluding that a mistrial is

appropriate." *Id.*

The Supreme Court has counseled that there exists a "spectrum of trial problems which may warrant a mistrial and which vary in their amenability to appellate scrutiny." *Id.* at 510. For instance, if "a mistrial has been granted in order to allow the state to achieve a tactical advantage, then the strictest scrutiny is appropriate. On the other hand, when a trial judge declares a mistrial because the jury was unable to reach a verdict, broad discretion must be allowed." *Crawford v. Fenton*, 646 F.2d 810, 817 (3d Cir. 1981) (citation omitted). Ultimately, however, a district court "must exercise prudence and care, giving due consideration to reasonably available alternatives to the drastic measure of a mistrial." *Rivera*, 384 F.3d at 56; *see also* Fed. R. Crim. P. 26.3 ("Before ordering a mistrial, the court must give each defendant and the government an opportunity to comment on the propriety of the order, to state whether that party consents or objects, and to suggest alternatives.").

The circumstances leading to a mistrial in this case are undoubtedly closer to those found in a jury deadlock situation, rather than those in which a prosecutor has sought to obtain a tactical advantage through a mistrial. Here, the government did not even seek a mistrial and, instead, consented to proceed to verdict with eleven jurors who had previously acquitted Islam of the honest services fraud charges in Phase I. Thus, while manifest necessity standard is a mixed question of law and fact subject to our plenary review, *Rivera*, 384 F.3d at 55, we will "afford great deference to the trial court's discretion," *Crawford*, 646 F.2d at 817.

13

## C.

In this case, we hold the District Court considered and exhausted all reasonably available alternatives such that its decision to declare a mistrial was manifestly necessary. It therefore did not abuse its discretion when it discharged the jury.

Once becoming aware that Juror 3 had been infected with COVID-19, the District Court attempted to avoid a mistrial by requesting that the parties consent to proceed with a jury of eleven. The District Court also considered adjourning the trial for five days and reconvening once Juror 3 recovered from COVID, but it reasonably rejected this alternative as impractical given the cumulative stress on the jury from a lengthy and difficult trial, issues with some jurors not being compensated during their extended period of service, and scheduling conflicts that further delay would cause due to the jury foreperson's long-planned overseas family vacation. We have previously recognized that it is proper for district courts to consider factors such as juror fatigue, inability to concentrate, frustration, and length of service in an analysis of manifest necessity, *Crawford*, 646 F.2d at 819, and will not disturb the District Court's painstaking analysis as to the practicality of a five-day-long adjournment.

It is plainly obvious, then, that the District Court's finding of manifest necessity was correct. When defense counsel advised that Islam would not proceed with fewer than twelve jurors and did not offer any additional alternatives, the District Court's only remaining option was to declare a mistrial.

14

Islam concedes his refusal to proceed with a jury of eleven made the declaration of a mistrial "unavoidable." Islam Br. 17. Instead, he contends the prior dismissal of Juror 6—the juror who suffered the sudden an unexpected death of his cousin—was unnecessary and "the proximate or precipitating cause of the mistrial." *Id.* This argument fails. Despite Islam's characterization of the facts, the dismissal of Juror 6 was not "the very last event before recessing for a three-day weekend." *Id.* at 20-21. In fact, after Juror 6 was dismissed during the lunch break on Thursday, November 3, trial continued for the rest of that afternoon and the following day. The District Court declared a mistrial on Monday, November 7—following a two-day weekend during which another juror tested positive for COVID-19. The "proximate or precipitating causes" of the mistrial were, accordingly, the two events that left the District Court with no way to proceed to verdict: (1) Juror 3 contracting COVID-19 and (2) Islam refusing to continue on with eleven jurors.

Even if we accept Islam's logic—which, notably, would mean the mistrial had countless proximate causes, including the dismissal of four other jurors over the course of a nearly six-week trial—his challenge would fail because the District Court did not abuse its discretion when it dismissed Juror 6. "It should go without saying that decisions related to juror substitution are within the discretion of the trial court." *United States v. Penn*, 870 F.3d 164, 171 (3d Cir. 2017). Here, the District Court thoughtfully considered alternatives to dismissing Juror 6. In addition to asking Juror 6 to continue his service, the District Court thoroughly analyzed the alternative offered by defense counsel—adjourning on Friday to allow the juror to grieve over the weekend. But the District Court reasonably rejected this alternative because of Juror 6's level

15

of distraction and issues that a Friday recess would cause given an already-scheduled recess the next week for Election Day. The District Court's decision to dismiss Juror 6 was therefore not "arbitrary, fanciful, or clearly unreasonable" such that "no reasonable person would adopt [its] view," *United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010) (quoting *United States v. Starnes*, 593 F.3d 196, 214 (3d Cir. 2009)), and did not constitute an abuse of discretion.

D.

Islam attempts to rely on three of our prior cases—*United States v. Pharis*, 298 F.3d 228 (3d Cir. 2002), *Love v. Morton*, 112 F.3d 131 (3d Cir. 1997), and *United States v. McKoy*, 591 F.2d 218 (3d Cir. 1979)—to contend the District Court erred in finding manifest necessity. We are unconvinced.

In *Pharis*, the district court dismissed the jury pending an interlocutory appeal of an evidentiary ruling. 298 F.3d at 233. We held there was no manifest necessity to declare a mistrial because there were "clear alternatives to termination," including staying the trial during the pendency of the appeal. *Id.* at 242. The jury in *Pharis*, however, had only served for a few days before being discharged, *id.* at 233, whereas the jury in this case had served for nearly six weeks. And, as Islam concedes, when the District Court declared a mistrial, it was "unavoidable." Islam Br. 17. Because there were no "clear alternatives to termination" when the District Court declared a mistrial, Islam's reliance on *Pharis* is misplaced.

*Love* dealt with a habeas petitioner who challenged his conviction after having been tried twice in state court for robbery and armed robbery. 112 F.3d at 133-35. In the first

16

trial, the judge abruptly declared a mistrial without input from counsel after learning his mother-in-law had died. *Id.* at 134-35. We held there was no manifest necessity to declare a mistrial because the court did not consider reasonable alternatives to dismissing the jury, including temporarily excusing the jury so the parties could explore the option of continuing the trial with the same jury in front of a different judge. *Id.* at 137. In *McKoy*, we similarly found no manifest necessity where the trial judge hastily declared a mistrial without considering clearly available alternatives after it became clear the defendant's trial attorney might have been a material witness. 591 F.2d at 219-21. As previously discussed, the District Court here only declared a mistrial after carefully considering and rejecting all reasonable alternatives. Neither *Love* nor *McKoy* provides a basis for reversal.

\* \* \*

The District Court recognized it faced "unwelcome choices" as unexpected issues outside of its control resulted in a constitutionally insufficient number of jurors. Nonetheless, the District Court consistently acted within its discretion and respected the integrity of the trial process. *See, e.g.*, Dkt. 461, at 77:9. When Islam withheld his consent to proceed with a jury of eleven, the District Court correctly recognized that "the only choice that remain[ed]" was to declare a mistrial. Dkt. 463, at 7:7. Because the District Court appropriately declared a mistrial based on manifest necessity, the Double Jeopardy Clause does not bar Islam's reprosecution and conviction.[5]

---

[5] The Government also contends Islam consented to the declaration of a mistrial. Because we conclude the District

17

## III.

We will affirm the District Court's order as to Islam and dismiss Dawan's appeal as moot.

---

Court correctly declared a mistrial based on manifest necessity, we will decline to reach this issue on appeal.