NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 24-2331
_____

UNITED STATES OF AMERICA

v.

ABDUR RAHIM ISLAM,
Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No. 2:20-cr-00045-001
District Judge: The Honorable Gerald A. McHugh

_____

Submitted under Third Circuit L.A.R. 34.1(a)
September 19, 2025

Before: RESTREPO, MCKEE, and SMITH, *Circuit Judges*
(Filed January 8, 2026)

_____

OPINION[*]

_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

SMITH, *Circuit Judge*.

Legend has it that J.P. Morgan acquired Carnegie Steel during a round of golf. The deal made Andrew Carnegie, in turn, the richest man in the world—so one could perhaps forgive his having characterized the green fee as a "business expense." But jurors in the underlying prosecution from which this appeal stems did not extend that same magnanimity to Abdur Rahim Islam, whose capacious conception of "business expenses" encompassed more than a single day's green fee. He attempted to "write off" Jamaican getaways, gym memberships, and bribes. Islam appeals after he was convicted for violating 18 counts of federal law involving allegations of fraud, conspiracy, and tax evasion. For the following reasons, we will affirm both the convictions and corresponding sentence.

I

Islam served as chief executive officer of what he referred to as Universal Companies, comprising (as relevant here) two Section 501(c)(3) non-profits: Universal Community Homes ("UCH") and Universal Education Companies ("UEC"). During his tenure, he diverted funds from UCH to finance, among other luxuries, personal vacations, expensive dinners, and multiple gym memberships. He also reimbursed himself—out of UCH's coffers—for political donations he made in Pennsylvania and Wisconsin. And when he discovered that UEC lacked the capital to satisfy its lease obligations at two Milwaukee-based charter schools, Islam bribed Milwaukee Public School Board President Michael Bonds with payments disguised as purchases made at Bonds' business, "African American Books and Games." In exchange, Bonds helped convince the Milwaukee Public

School Board to approve a lease deferral plan, temporarily relieving UEC of its duty to make $500,000 in lease payments for both the 2015-16 and 2016-17 school years.

Islam may have been too brazen in his graft because he eventually attracted the attention of the FBI. After an investigation, he was arrested pursuant to a 22-count indictment returned on January 28, 2020. The procedural odyssey that followed has spanned five-plus years and included three trials and multiple appeals. The first trial, held in March and April 2022, resulted in a hung jury. Retrial commenced in September 2022, but a combination of tragedy (deaths in the family) and misfortune (the spread of COVID-19 amongst jurors) depleted the pool until fewer than 12 members remained. At that point, the District Court declared a mistrial and scheduled a second retrial for February 2023. Before that trial could begin, though, Islam filed a motion to dismiss, arguing that the Constitution's Double Jeopardy Clause prohibited further prosecution. The District Court denied the motion, and Islam appealed. While the case was on appeal, a federal grand jury returned an 18-count superseding indictment. In March of 2024, a jury found Islam guilty on all counts. We affirmed the denial of his motion to dismiss two months later. *See United States v. Islam*, 102 F.4th 143, 145 (3d Cir. 2024). The District Court then sentenced Islam to 84 months in prison, followed by three years of supervised release. He timely appealed on July 19, 2024**,** and now challenges: (1) the admission of evidence of an immunity agreement; (2) the sentencing calculations; and (3) the denial of his motion to dismiss on double jeopardy grounds.

## II

The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction to review the order of judgment under 28 U.S.C. § 1291 and the sentence imposed under 18 U.S.C. § 3742. We review the District Court's decision to admit evidence in a criminal trial for abuse of discretion. *United States v. Serafini*, 233 F.3d 758, 768 n.14 (3d Cir. 2000). With respect to the sentence imposed, we review factual findings for clear error and exercise plenary review over the District Court's interpretation of the Sentencing Guidelines. *United States v. Grier*, 475 F.3d 556, 570 (3d Cir. 2007) (en banc). As for a motion to dismiss an indictment, we assess factual findings for clear error and evaluate legal conclusions de novo. *See Islam*, 102 F.4th at 148.

## A

At trial, the Government presented testimony from Karren Dunkley, Islam's former romantic partner. Dunkley testified that Islam had paid for her stay at the Ritz Carlton in Jamaica**,** and reimbursed her for political contributions he'd asked her to make on his behalf. She also answered a series of Court-approved questions:

> Q. Did federal agents interview you in connection with this investigation?
> A. Yes.
> Q. Did they show you the checks that you paid to political campaigns?
> A. . . . They may have during the interview.
> Q. Did they ask you whether Mr. Islam had asked you to make those campaign contributions?
> A. Yes.
> Q. Did you lie to federal agents?
> A. Yes.
> Q. Is that why your lawyer requested immunity for you before you would testify today?

A. Yes.

A830. The Court then instructed the jury:

> I've allowed you to hear this so that you understand the posture of the witness in the case and her history [and] relationship to Mr. Islam. But Mr. Islam is not in this case on trial for reimbursement illegally of campaign contributions. All right? That's not one of the charges before you. I'm allowing you to hear it in terms of background and context only.

A831. Islam argues that, despite the cautionary instruction, the District Court erred when it permitted the government to elicit testimony as to the precise reason for Dunkley's immunity agreement, especially because the superseding indictment did not include any charges related to the political contribution scheme.

Judges should not be insensitive to the worry that the Government might, in certain instances, attempt to "introduce, as impeachment evidence, unduly prejudicial evidence it could not otherwise have introduced." *United States v. Richardson*, 421 F.3d 17, 40 (1st Cir. 2005). But we have held that the "prejudicial effect" of that evidence "is typically cured through a curative instruction to the jury." *United States v. Universal Rehab. Servs. (PA), Inc.*, 205 F.3d 657, 668 (3d Cir. 2000). The District Court issued such an instruction in this case. And that instruction clearly and succinctly admonished the jury against drawing the very inference Islam feared would prejudice him. Under those circumstances, we refuse to hold that the District Court abused its discretion in admitting evidence of the immunity agreement.

Additionally, even if the District Court erred, that error was harmless. *See United States v. Bailey*, 840 F.3d 99, 124 (3d Cir. 2016) ("An evidentiary error is harmless if 'it is

5

highly probable that the error did not contribute to the judgment[.]'" (citation omitted)).

Dunkley's testimony was more of a cherry on top of the Government's case. She was but one of three witnesses who testified that Islam had—under the auspices of "business expenses"—paid for personal gifts like travel, accommodations, and meals. Considering "the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of [the] curative instruction[,] . . . and the strength of the evidence supporting [Islam's] conviction," we believe it is "highly probable" that Dunkley's reference to her immunity agreement "did not contribute to the judgment." *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc) (emphasis omitted); *see United States v. Gambino*, 926 F.2d 1355, 1366 (3d Cir. 1991) (affirming a conviction where the error was harmless "because [the witness] did not play a central role in either the conspiracy or the government's case"). Accordingly, we conclude that the District Court did not abuse its discretion when it permitted the government to broach the existence of the immunity agreement with Dunkley.

B

The version of the United States Sentencing Guidelines applicable to Islam's honest services conviction provides:

> If the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $6,500, increase [the base offense level] by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

6

U.S.S.G. § 2C1.1(b)(2). The jury found Islam guilty of honest services wire fraud based on the bribes he funneled to School Board President Bonds in exchange for lease deferrals at UEC's Milwaukee charter schools. The District Court calculated that UEC benefited from these bribes to the tune of about "a million dollars." A2377. Alternatively, it found that UEC's departure from Milwaukee "result[ed] in the Milwaukee Public School Board [("MPS")] never getting the rent that had been deferred," amounting, again, to about one million dollars in losses. A2377. Thus, referring to the table in Section 2B1.1(b)(1), the Court increased Islam's offense level by 14 points.

Islam believes the District Court overstated both the benefit to UEC and the losses to MPS. He contends that "[a] bribery scheme which results in the deferral (i.e., the mere delay) of a payment obligation is not the same thing as one which voids a payment obligation entirely." Reply 4. In other words, as Islam sees it, "the 'loss' to MPS (or, alternatively, the 'gain' to [UEC]) would be the time value of the sum delayed over the length of the deferral period." Appellant's Br. 21. Crucially, though, UEC never satisfied its deferred obligations. The District Court, therefore, found that UEC's departure (and corresponding failure to make good on the lease) was "inextricably linked" to the bribes that occasioned the deferral. A2378. Put another way, because UEC never repaid the deferred money, the bribery scheme "proximately caused" MPS about one million dollars in losses.

Islam's argument would have greater purchase had UEC, at some point, remitted the deferred lease payments. Instead, though, UEC retained control of the leased buildings under the promise of future payments—payments it never made. This deprived MPS of the

7

opportunity to rent those buildings to other tenants. "Loss" under Section 2B1.1 of the Sentencing Guidelines means "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, cmt. n.3(A)(i) (Nov. 2023). At the time he bribed Bonds, Islam knew that UEC was in a "money crisis." A2313. But he ignored his CFO's directive to slash expenses, instead opting to delay insolvency through graft. It was reasonably foreseeable that such a scheme would leave UEC in arrears, thereby denying MPS both rent and the ability to seek a new tenant. Based on this, we cannot say that the District Court committed clear error in its calculations. *See United States v. Williams*, 898 F.3d 323, 332 (3d Cir. 2018) (holding that a District Court's findings of fact should not be overturned unless they are "completely devoid of minimum evidentiary support displaying some hue of credibility" or "bear[] no rational relationship to the supportive evidentiary data").

C

This Court's last encounter with Islam ended when we determined that "the Double Jeopardy Clause [did] not bar [his] reprosecution and conviction." *Islam*, 102 F.4th at 152. That holding obtains to this day. *See* 3d Cir. I.O.P. 9.1 (providing "that the holding of a panel in a precedential opinion is binding on subsequent panels"). He nevertheless reprises his double jeopardy argument here "to preserve it for potential review at a higher level." Appellant's Br. 24. But he recognizes that we are "bound to rule adversely on this point." *Id.* Consistent with his expectations, we adhere to the prior panel's decision for the reasons given therein. *See Islam*, 102 F.4th at 152.

## III

We will affirm the District Court's evidentiary ruling, sentencing calculations, and denial of Islam's motion to dismiss.